Gregory H. Guillot
*Admitted Pro Hac Vice*
gregory@guillot-law.com
GREGORY H. GUILLOT, P.C.
13727 Noel Road, Suite 200
Dallas, TX 75240
Telephone: (972) 774-4560
Facsimile: (214) 515-0411

Stephen M. Doniger (SBN 179314)
stephen@donigerlawfirm.com
Scott Alan Burroughs (SBN 235718)
scott@donigerlawfirm.com
DONIGER / BURROUGHS APC
603 Rose Avenue
Venice, CA 90291
Telephone: (310) 590-1820
Facsimile: (310) 517-3538

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DONNA CORBELLO,<br><br>Plaintiff,<br><br>vs.<br><br>FRANKIE VALLI, ROBERT J. GAUDIO, MARSHALL BRICKMAN, ERIC S. ELICE, GRAHAM KING, CLINT EASTWOOD, ROBERT LORENZ, GETTING HOME, INC., HEDGEHOG, INC., GK FILMS, LLC, WAGW, INC., WARNER BROS. ENTERTAINMENT, INC., WARNER BROS. PICTURES, INC., WB STUDIO ENTERPRISES, INC., WARNER BROS. PICTURES INTERNATIONAL, WARNER BROS. DISTRIBUTING, INC., WARNER HOME VIDEO, INC., RATPAC ENTERTAINMENT, LLC, RATPAC-DUNE ENTERTAINMENT, LLC, RATPAC ACCESS ENTERTAINMENT, LLC, and MALPASO PRODUCTIONS, LTD,<br><br>Defendants. | Case No. 2:17-cv-4588-RGK(PLAx)<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT, VICARIOUS COPYRIGHT INFRINGEMENT, AND CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Donna Corbello, by her attorneys, and pursuant to, *inter alia*, Fed. R. Civ. P. 15(a)(1)(A), hereby alleges the following for her *First Amended Complaint* against the above-named Defendants:

**JURISDICTION**

1. This Court has subject matter jurisdiction over this action, under 28 U.S.C. § 1338(a) [actions arising under Acts of Congress relating to copyrights]; 28 U.S.C. § 1331 [actions arising under the Constitution, laws or treaties of the U.S.], and 28 U.S.C. § 1367(a) [supplemental jurisdiction over related claims, including claims involving joinder of parties]. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), in that the parties are citizens of different States; the amount in controversy exceeds $75,000.00 as to each defendant, exclusive of interest and costs, and the exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a) is consistent with the jurisdictional requirements of 28 U.S.C. § 1332, in accordance with 28 U.S.C. § 1367(b).

**VENUE**

2 Venue is proper in this District under 28 U.S.C. §§ 1400(a) and 1391(b)(2).

**THE PARTIES**

3 Plaintiff, Donna Corbello, an individual, domiciled in Navasota, Texas, is the widow and heir of Rex Conrad Woodard ("Woodard"), who co-authored an unpublished, biographical literary work ("the Work") about guitarist, Thomas Gaetano DeVito ("DeVito") and the pop group, *The Four Seasons*, which was completed shortly before Woodard's death in 1991. Plaintiff inherited Woodard's rights in the Work; is his successor in an agreement with DeVito regarding same; and, co-owns the copyright therein with DeVito.

4 Defendant, Frankie Valli ("Valli"), an individual, domiciled in Calabasas, California, was an original member of *The Four Seasons*, and upon information and belief, is involved in a longstanding, informal partnership with

Defendant, Robert J. Gaudio, doing business as "The Four Seasons Partnership" from an office in Los Angeles, California. Defendant Valli was also a party to a 1999 agreement with DeVito ("the 1999 Agreement") which assigned certain of DeVito's exclusive rights in the Work to Valli and Gaudio, subject to a "reversionary clause" that caused the agreement to lapse on December 10, 2004. Despite this lapse, and the consequent reversion of rights to DeVito, and despite the absence of any license from Plaintiff, DeVito, or any other person with rights in the Work: (a) the Work was used, reproduced, and distributed in its entirety, parts thereof were performed, and protected elements therein were copied, paraphrased, and adapted for the musical stage play, *Jersey Boys*; (b) Valli and Gaudio subsequently purported to license and/or assign these lapsed and reverted rights, or portions thereof, to others, retroactively, including the writers and an early producer of the *Jersey Boys* play; and, (c) subsequent producers executed further "assignments" and/or "licenses" of these rights, leading to extensive performance of the play in the U.S. and abroad, and to litigation between Plaintiff and Defendants Valli, Gaudio, Marshall Brickman, Eric S. Elice, and others, in District of Nevada Civil Action No. 2:08-cv-00867-RCJ-PAL ("the Theatrical Litigation"). Finally, during an interim appeal in the Theatrical Litigation, Valli and Gaudio purported to assign further rights under the lapsed *1999 Agreement* to Defendants Warner Bros. Pictures, Inc., WB Studio Enterprises, Inc., and/or Warner Bros. Entertainment, Inc., resulting in a film adaptation of the play ("the *Jersey Boys* Movie"), which is the subject of this litigation; for which Valli was an "Executive Producer," and which still includes protected expression from the Work.

5 Defendant, Robert J. Gaudio ("Gaudio"), an individual, domiciled in Nashville, Tennessee, was also an original member of *The Four Seasons*, and upon information and belief, is involved, with Defendant Valli, in a longstanding, informal partnership doing business as "The Four Seasons Partnership" from an office in Los Angeles, California. Defendant Gaudio, with Valli, was also an assignee of certain

rights in the Work, under the lapsed *1999 Agreement* with DeVito; was a defendant in the Theatrical Litigation; and, while an interim appeal therein was pending, purported to assign, with Valli, rights in the lapsed *1999 Agreement* to Defendants Warner Bros. Pictures, Inc., WB Studio Enterprises, Inc., and/or Warner Bros. Entertainment, Inc., resulting in the production and distribution of the *Jersey Boys Movie*, for which Gaudio was an "Executive Producer," and which includes protected expression from the Work.

6. Defendant, Marshall Brickman ("Brickman"), an individual, domiciled in New York, New York, is a musician, writer, and screenwriter, who co-authored the *libretto* for the *Jersey Boys* play with Defendant, Eric S. Elice; is a defendant in the Theatrical Litigation; is an officer of Defendant, Hedgehog, Inc.; and, was a co-author, with Defendant Elice, of the screenplay for the *Jersey Boys Movie*, which was adapted from the *libretto* for the *Jersey Boys* play, and contains protected expression from the Work. Upon information and belief, on or about October 4, 2010, while the Theatrical Litigation was pending, Defendants Brickman and Elice assigned their rights in the *Jersey Boys libretto* to Defendant, WAGW, Inc., for the purpose of adapting same for a motion picture, and agreed to write the screenplay for the *Jersey Boys Movie* as a "work for hire" on Defendant WAGW's behalf. Upon information and belief, a "final draft" of this screenplay was presented to Defendant WAGW in May 2013, and subsequently assigned by Defendant WAGW to Defendant, Warner Bros. Entertainment, Inc.

7. Defendant, Eric S. Elice, a/k/a Rick Elice ("Elice"), an individual, upon information and belief domiciled in New York, New York, is a writer, director, producer, and performer, who co-authored the *libretto* for the *Jersey Boys* play with Defendant Brickman; is a defendant in the Theatrical Litigation; is an officer of Defendant, Getting Home, Inc.; and, was a co-author, with Brickman, of the screenplay for the *Jersey Boys Movie*, which was adapted from the *Jersey Boys* play and contains protected expression from the Work. Upon information and belief, on

or around October 4, 2010, while the Theatrical Litigation was pending, Defendants Elice and Brickman assigned their rights in the *Jersey Boys libretto* to Defendant, WAGW, Inc., for the purpose of adapting same for a motion picture, and agreed to write the screenplay for the *Jersey Boys Movie* as a "work for hire" on Defendant WAGW's behalf. Upon information and belief, a final draft of this screenplay was presented to Defendant WAGW in May 2013, and subsequently assigned by Defendant WAGW to Defendant, Warner Bros. Entertainment, Inc.

8. Defendant, Graham King ("King"), an individual, upon information and belief domiciled in Pacific Palisades, California, is a film producer; the managing member of Defendant, GK Films, LLC; the Chief Executive Officer of Defendant, WAGW, Inc.; and, a producer of the *Jersey Boys Movie*.

9. Defendant, Clint Eastwood ("Eastwood"), an individual, upon information and belief domiciled within this District, and having an office in Los Angeles, California, is an actor, director, and producer; is an officer, shareholder, and/or director of Defendant, Malpaso Productions, Ltd.; was the director of the *Jersey Boys Movie*; and, was as a producer thereof.

10. Upon information and belief, Defendant, Robert Lorenz ("Lorenz"), an individual, domiciled in Pasadena, California, is a collaborator of Defendant Eastwood, and a producer of the *Jersey Boys Movie*.

11. Defendant, Getting Home, Inc. ("Getting Home"), a Nevada corporation, with a registered office at 16000 Ventura Blvd., Suite 1102, Encino, California 91435, is a defendant in the Theatrical Litigation, and a "loan-out" company for the screenwriting services of Defendant Elice, with compensation for such services paid to Getting Home, which in turn, is responsible for Elice's compensation. Upon information and belief, Getting Home is also a signatory to the October 4, 2010 agreement under which Elice and Brickman wrote the screenplay for the J*ersey Boys Movie*, for Defendant WAGW, on a "work for hire" basis.

12. Upon information and belief, Defendant, Hedgehog, Inc. ("Hedgehog"),

a New York corporation, with a registered office at 488 Madison Avenue, 10th Floor, New York, New York 10022, is a "loan-out" company through which Defendant Brickman's screenwriting services are provided, with compensation for such services paid to Hedgehog, which in turn, is responsible for Brickman's compensation. Upon information and belief, Hedgehog is also a signatory to the October 4, 2010 agreement through which Brickman and Elice wrote the screenplay for the *Jersey Boys Movie*, for Defendant WAGW, on a "work for hire" basis.

13. Defendant, GK Films, LLC ("GK Films"), is a California limited liability company with a principal office at 1221 2nd Street, Suite 200, Santa Monica, California 90401. Upon information and belief, in late-2010, Defendant GK Films negotiated for, and formally or informally acquired the initial rights to adapt the theatrical production of *Jersey Boys* for film, and was a producer of the *Jersey Boys Movie*.

14. Upon information and belief, Defendant, WAGW, Inc. ("WAGW"), a California corporation, with a principal office at 1221 2nd Street, Suite 200, Santa Monica, California 90401, was an assignee of the rights held by Defendants Brickman and Elice in the *libretto* for the *Jersey Boys* play, for the purpose of adapting same for film, and the initial owner of the screenplay for the *Jersey Boys Movie*, completed by Brickman and Elice in or around May 2013, under a "Writer Loanout Agreement" executed by WAGW, Elice, Getting Home, Brickman, and Hedgehog, and purportedly made effective as of October 4, 2010. Upon information and belief, WAGW subsequently assigned its rights in said screenplay to Defendant, Warner Bros. Entertainment, Inc.

15. Upon information and belief, Defendant, Warner Bros. Entertainment, Inc. ("Warner Bros. Entertainment"), a Delaware corporation, with a principal place of business at 4000 Warner Boulevard, Burbank, California 91522, is the current owner, or a co-owner of the *Jersey Boys Movie*; holds or co-owns the copyrights in the film, and in the screenplay therefor; has distributed and performed, or assigned

and/or licensed rights to others to distribute, perform, or further authorize the distribution and performance of the film; has assigned and/or licensed rights to others, including Defendant, Warner Home Video, Inc., to prepare, promote, and/or distribute home video versions thereof, including DVD, Blu-ray, streaming media, and digital pay-per-view versions; and, has licensed and/or authorized others to license, *inter alia*, the performance and promotion of the *Jersey Boys Movie* via cable, satellite, pay-per-view, "on demand," and broadcast television services.

16. Upon information and belief, Defendant, Warner Bros. Pictures, Inc. ("Warner Bros. Pictures"), a Delaware corporation, with a principal office at 4000 Warner Boulevard, Burbank, California 91522, is a division of Defendant, WB Studio Enterprises, Inc., and a licensee of Defendant, Warner Bros. Entertainment, which owns the "Warner Bros. Pictures, Inc." logo and service mark. Upon information and belief, Warner Bros. Pictures was the owner and "author" of the *Jersey Boys Movie*, under a "Purchase Agreement" executed in August 2013, with Defendants Valli, Gaudio, Getting Home, Elice, and Brickman, and subsequently assigned said rights to Defendant Warner Bros. Entertainment.

17. Upon information and belief, Defendant, WB Studio Enterprises, Inc. ("WB Studio Enterprises"), a Delaware corporation, with a principal office at 4000 Warner Boulevard, Burbank, California 91522, is responsible for the activities of Defendant, Warner Bros. Pictures, which it refers to as a "division" of WB Studio Enterprises, and is a party, through Warner Bros. Pictures, to the "Purchase Agreement" for the *Jersey Boys Movie*, executed in August 2013 with Defendants Valli, Gaudio, Getting Home, Elice, and Brickman.

18. Upon information and belief, Defendant, Warner Bros. Pictures International, a film production and distribution company with a principal office at 4000 Warner Boulevard, Burbank, California 91522, is a subsidiary of Defendant, Warner Bros. Pictures, responsible for, *inter alia*, international distribution of the *Jersey Boys Movie*.

19. Upon information and belief, Defendant, Warner Bros. Distributing, Inc. ("Warner Bros. Distributing") is a Delaware corporation, with registered offices at 4000 Warner Boulevard, Burbank, California, 91522, and One Time Warner Center, New York, New York, 10019, which conducts business under the trade name, "Warner Bros. Pictures Domestic Distribution," and is a domestic distributor of the *Jersey Boys Movie.*

20. Upon information and belief, Defendant, Warner Home Video, Inc. ("Warner Home Video"), a Delaware corporation, with a principal office at 4000 Warner Boulevard, Burbank, California 91522, is, *inter alia*, the home video distribution arm of Defendant, Warner Bros. Entertainment, and the distributor of home video versions of the *Jersey Boys Movie*, in the U.S., and abroad.

21. Upon information and belief, Defendant, RatPac Entertainment, LLC ("Ratpac Entertainment"), a Delaware limited liability company with a registered office at 4000 Warner Boulevard, Bldg. 95, Burbank, California 91522, is a motion picture production and financing company, which co-produced and financed the *Jersey Boys Movie*, and is a co-owner, mortgagee, and/or co-claimant of the copyright therein.

22. Upon information and belief, Defendant, RatPac-Dune Entertainment, LLC ("Ratpac-Dune"), a Delaware limited liability company, with a principal office at 5851 W Charleston Boulevard, Las Vegas, Nevada 89146, is a motion picture production and financing company which co-produced and finance the *Jersey Boys Movie*, and is a co-owner, mortgagee, and/or co-claimant of the copyright therein.

23. Upon information and belief, Defendant, RatPac Access Entertainment, LLC (formerly, "RatPac Entertainment II, LLC"), a Delaware limited liability company with a registered office at 4000 Warner Boulevard, Bldg. 95, Burbank, California 91522, is a motion picture production and financing company, which participated in the financing of the *Jersey Boys Movie*, and is a co-owner, mortgagee, and/or co-claimant of the copyright therein.

24. Upon information and belief, Defendant, Malpaso Productions, Ltd, a California corporation, with a principal place of business at 4000 Warner Boulevard, Bldg. 16, Burbank, California 91522, is Defendant Eastwood's production company, and a producer of the *Jersey Boys Movie*.

## NATURE OF THIS ACTION

25. This is an action for copyright infringement, under Section 501(a) of the Copyright Act of 1976, as amended [17 U.S.C. § 501(a)], against Defendants Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, Warner Home Video, and Malpaso Productions, arising from their unlicensed and unlawful exercise of exclusive rights in the Work that are reserved to authors and copyright owners under 17 U.S.C. § 106, and are held, indivisibly, by Plaintiff and DeVito, as co-owners of the Work, including: (a) the authorization of others to prepare derivative works based on the Work, or based on the infringing *libretto* for the *Jersey Boys* play, by Defendants Valli, Gaudio, Brickman, Elice, King, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, and WB Studio Enterprises; (b) the preparation and production of derivative works based on the Work, and/or the preparation and production of works containing protected expression therefrom, by Defendants Valli, Gaudio, Brickman, Elice, Eastwood, Lorenz, Malpaso Productions, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, and Warner Home Video; (c) the direct copying, close paraphrasing, and adaptation of protected expression within the Work for the *Jersey Boys Movie*, by Defendants Brickman and Elice; and, (d) the distribution of copies of the infringing *Jersey Boys Movie* in various media of expression, by sale, rental, lease, or lending, and the licensing of others to distribute and perform same, in movie theaters; on television, including cable, satellite, pay-per-view, broadcast, and "on demand" television services; and, through home video distribution channels,

including DVD, Blu-ray, streaming media, and digital pay-per-view, by Defendants Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, d/b/a Warner Bros. Pictures Domestic Distribution, and Warner Home Video.

26. This is also an action for contributory copyright infringement against Defendants Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, Warner Home Video, RatPac Entertainment, RatPac-Dune Entertainment, RatPac Access Entertainment, and Malpaso Productions, who knew, should have known, and/or had reason to know of the infringing activity, yet induced, caused and/or materially contributed to the infringing conduct of other Defendants herein.

27. Finally, this is an action for vicarious copyright infringement against Defendants Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, RatPac Entertainment, RatPac-Dune Entertainment, RatPac Access Entertainment, and, Malpaso Productions, who had the right and ability to supervise and control the infringing acts, and received direct financial benefits from the infringements.

## STATEMENT OF FACTS

28. Plaintiff's husband, Rex Woodard, was a well-respected member of the Beaumont, Texas legal community, and a freelance writer with a national reputation in the field of classic rock and roll music. Born in Dallas, Texas on April 10, 1950, Woodard moved to Beaumont in 1975, after obtaining his law degree and passing the Texas Bar Exam. He began his career as an associate with a small firm, and in 1977, founded Woodard and Lindsay, where he practiced law through October 1984. Thereafter, he established a solo trial practice, and was certified in civil trial law by

the Texas Board of Legal Specialization in 1987. Woodard met Plaintiff in 1981, and the two married on May 17, 1986.

29. Woodard had been enamored of writing and music from an early age, and his skill with the written word, knack for compelling story-telling, and knowledge of popular music developed into an avocation he hoped would form a career. As a child of four or five years old, he "dictated" elaborate stories of wartime to his mother, who typed them for the entire family to ponder and enjoy. As he grew older, he wrote stories about baseball to share with friends, and articles about his coin collection. In high school, he served on the editorial staff of the yearbook, and joined the Journalism Club. During law school, he was Editor of the Student Bar Association's newspaper, and later, while maintaining his law practice, he pursued a secondary career as a freelance writer, publishing articles about 1960's popular music. An avid record collector throughout his life, and a rock trivia buff, he began writing for *Goldmine Magazine* in the late-1970's, contributing articles about Terry Cashman, lead singer of the Chevrons; Dave Dee, Dozy, Beaky, Mick & Tich, a German pop group with hit singles in the U.S. and Europe, and others.

30. Woodard's best work, however, was reserved for *The Four Seasons*, who, with lead singer Frankie Valli, composer and keyboard player, Bob Gaudio, guitarist, Tommy DeVito, bassists Nick Massi and (later) Joe Long, and writer/producer Bob Crewe, were his favorite musical artists. Woodard had endeavored to track every public development in *The Four Seasons*' history since purchasing the single, "Candy Girl," at 13; collected the band's records and maintained a discography of its recordings, including rare bootlegs and limited edition fan club releases; amassed an extensive collection of rare photographs and newspaper clippings regarding the group; and contributed to a *Four Seasons* "fanzine" published in the U.K. Moreover, *The Four Seasons* were aware of his interest and writings, as evidenced by the true copy of a memo to Woodard from Defendant Gaudio's office, dated October 17, 1980, and attached as *Exhibit 1*. Thus,

Woodard was both enthusiastic and well-prepared when an opportunity arose to write a feature article about the group for *Goldmine* in 1981. A true copy of this article, entitled, *THE FOUR SEASONS A Lesson in Survival*, as published in August 1981, is attached as *Exhibit 2*. The article was well-received, and to date, remains the definitive published history of *The Four Seasons*' "lost years" – between 1970, when the group slipped from public consciousness, and 1975, when a reconstituted line-up returned to chart-topping status with the singles, "Who Loves You" and "December 1963 (Oh What a Night)."

31. Upon information and belief, Woodard's 1981 *Goldmine* article garnered respect from Defendants Valli and Gaudio, and former group members Nick Massi and Joe Long, and whetted Woodard's own curiosities concerning the earliest history of *The Four Seasons*. Accordingly, shortly after the article was published, Woodard conducted interviews with early members of the group, in preparation for a second article focused on the formation of *The Four Seasons*, and its predecessor, *The Four Lovers*, which DeVito led. On December 9, 1981, for this article, Woodard interviewed DeVito for the first time, covering a wide range of topics. A true copy of a representative excerpt of Woodard's handwritten notes from this interview is attached as *Exhibit 3*. On December 23, 1981, Woodard interviewed DeVito's brother, Nick DeVito, an early member of *The Four Lovers*, and its predecessor groups, the *Varietones* and the *Variety Trio*, and DeVito was also present. A true copy of a page from Woodard's notes concerning this 1981 interview with Nick DeVito is attached as *Exhibit 4*, and true copies of representative notes from Woodard's interview with DeVito on the same date are attached as *Exhibit 5*. On January 8, 1982, Woodard also interviewed Nick Massi – an occasional member of *The Four Lovers*, *Varietones*, and *Variety Trio*, and a founding member of *The Four Seasons*, who rarely granted interviews. True copies of representative notes from this interview are attached as *Exhibit 6*. The resulting article, published in the June 1982 issue of *Goldmine*, and entitled, *THE FOUR LOVERS Forerunners to the Fabulous Four*

*Seasons*, was, like Woodard's first, a definitive piece, providing information regarding the group's origins that had not previously been made public, and it is still referenced by fans. A true of this article, as published, is attached as *Exhibit 7*.

32. Woodard would later observe, with respect to the interviews for his 1982 *Goldmine* article, that as an attorney who had taken numerous depositions, he suspected he was not getting "the whole story" from Nick Massi and the DeVito brothers. Of particular interest were the"gaps" between the real ages of *The Four Seasons'* members and their "published" ages, as reported in promotional press releases – a gap of eight years for DeVito and Massi, and several years for Valli and early-member Nick DeVito. Whereas, such discrepancies were not unusual in the entertainment industry, Woodard was intrigued by each member's inability (or unwillingness) to account for his activities during those "missing years." These gaps would be filled five or six years later, when DeVito presented Woodard with the opportunity to write the Work. Meanwhile, Woodard continued his independent research, and fan-related writing, collecting, and news-clipping activities, while keeping in contact with individuals close to the band. For example, as shown in the true copy of a June 10, 1983 letter from Defendant Valli to Woodard, attached as *Exhibit 8*, Woodard sent items from his personal *Four Seasons* collection to Valli that year, for inclusion in a souvenir tour book under consideration, and Plaintiff and Woodard were Valli's guests at a concert in Houston, Texas on September 24, 1983. Woodard also kept in touch with DeVito, as shown in the true copies of notes and cards he received from DeVito between 1982 and 1986, attached as *Exhibit 9*.

33. Upon information and belief, Woodard's writings appeared in a tour program for a 1980's *Four Seasons* line-up, along with photographs from his personal collection. Sometime thereafter, Woodard received an unexpected call from DeVito, who, while no longer a member of the group, had obtained a copy of the program, and marveled at the photographs, some of which he had never seen. A dialogue ensued, and DeVito informed Woodard that he had a sensational story to tell, and wanted

Woodard to write it.

34. Shortly after this conversation, in November 1988, Woodard flew to Las Vegas, with Plaintiff and their youngest daughter, and began a series of intensive interviews with DeVito, during which DeVito shared, for the first time with any journalist, the story of his unaccounted-for years. According to DeVito, most of those years, for himself and the other band members – excluding Valli and Gaudio – were devoted to criminal enterprises and long stretches in prison. Moreover, according to DeVito, these experiences led to underworld contacts that continued throughout *The Four Seasons*' popular era. These accounts differed radically from the public's perception of *The Four Seasons*, and Woodard was intrigued. He was also excited by the nature of the opportunity offered – not a mere article, but an opportunity to write DeVito's authorized biography, and tell *The Four Seasons*' story. Because DeVito, who had only an eighth grade education, could not write the Work, he asked Woodard to do so, with full credit for his efforts, and an equal share in any resulting profits. The Work was to be based on the Las Vegas interviews, which Woodard had recorded, and any other material Woodard might deem beneficial, subject to DeVito's approval of the final text. Woodard agreed to undertake the project, and returned to Beaumont to begin the process of creating the Work.

35. Two weeks later, on December 1, 1988, Woodard sent a letter agreement to DeVito, at DeVito's request, memorializing the parties' understandings regarding the Work, and DeVito signed the document and returned it to Woodard by mail. A true copy of this executed agreement, as recorded with the Copyright Office on November 14, 2008, is attached as *Exhibit 10.* The key understandings therein were as follows: (a) Woodard would write DeVito's authorized biography, based on the interviews DeVito had provided, "plus any other relevant information that would benefit the book;" (b) Woodard would "do all of the actual writing;" (c) DeVito would have control over the final text; (d) Woodard and DeVito would "be shown as co-authors [of the Work] with [DeVito] receiving first billing;" (e) would "share

equally in any profits arising from [the Work];" and, (f) the agreement would be binding upon the parties without limitation of term, and upon their heirs, as to obligations and benefits, if Woodard, DeVito, or both, should die. *Exhibit 10*, at p. 4.

36. Woodard labored over the Work for the next two years, drawing on the knowledge he had accumulated regarding *The Four Seasons* over a lifetime, including, *inter alia*, his previous articles for *Goldmine*; his interviews with Nick Massi and Nick DeVito; his two interviews with DeVito in 1981, and the interviews conducted with DeVito in 1988; his newspaper clippings, record albums, fanzines, and photographs; and the discographies he had compiled. Woodard also employed his skills as an attorney to gather information for the Work, including the filing of requests under the *Freedom of Information Act* with local and federal law enforcement agencies, to obtain DeVito's criminal records, and confirm alleged U.S. government efforts to link DeVito and/or *The Four Seasons* to organized crime. Woodard also created questionnaires for DeVito, covering all phases of his life, including such minutiae as favorite foods, the layout of his childhood home, his first sexual experience, his first wife's hair color, and hundreds of additional details, which DeVito provided. Upon information and belief, an additional questionnaire was prepared, and further interviews conducted, following *The Four Seasons'* 1990 induction into the Rock and Roll Hall of Fame, an event described in the Work. From this material, Woodard constructed an outline of DeVito's life; selected, organized, placed, rephrased, and embellished, the anecdotes, recollections, and minutiae he found compelling, and wrote the entire text of the Work, based on his perceptions of life through DeVito's eyes, and presented in a "first-person," narrative style appropriate to DeVito and the other characters, but utterly original to Woodard. Woodard worked night and day on the Work, retreating to his music room at home in the evenings to make notes and dictate portions thereof, and continuing his dictation during the day at his office, for transcription by his secretary, Myrtle Locke. Woodard's law practice suffered as a result of his devotion to the Work, but the Work

was more important to him.

37. As the Work neared completion in late-1990, Woodard began to seek a publisher. True copies of representative correspondence reflecting these efforts are attached as *Exhibit 11*. In connection therewith, he prepared a condensed, chapter-by-chapter outline of the Work for prospective publishers, a redacted true copy of which is shown in *Exhibit 11*, at pp. 4-5. DeVito also participated in efforts to find a publisher, and the parties provided a copy of Woodard's outline to actor, Joe Pesci, for the purpose of adapting the manuscript for a screenplay. *Id.*, at p. 3.

38. By December 7, 1990, Woodard was days away from completing a draft of the Work, and on December 11, he wrote Sandy Choron, of March Tenth, Inc. in New York, to solicit her services as a literary agent. A true copy of this letter is attached as *Exhibit 12*. Therein, Woodard recounted the history of his involvement with the Work, and his role in creating it; identified key "scenes;" described certain of the revelations contained therein; and confirmed he had been approached "about doing a screenplay on the project." *Exhibit 12*, at p. 3. Ultimately, Ms. Choron declined. However, as represented in the letter shown in *Exhibit 12*, Woodard completed a draft of the Work shortly thereafter, subject to final proofreading and line editing. Upon information and belief, anticipating that copies of the Work might be shared with prospective publishers the following month, Woodard placed a copyright notice on the title page, in the following form: "© January, 1991 Tommy Devito, Rex Woodard," with DeVito receiving top billing, as agreed. A true copy of the cover page of Woodard's last draft of the Work, together with the first page of text, is attached as *Exhibit 13*.

39. The Work, as completed by Woodard, was not a strictly factual account, as dictated by the style and manner in which it was written. Although it purports to be a biographical account of both DeVito and *The Four Seasons,* it is presented as a first-person narrative, with DeVito speaking in the present tense as the action evolves, and much of that action is portrayed through dialogue, including dialogue from events

at which DeVito was not present. The fact that much of this dialogue was "reconstructed," or resulted from Woodard's literary imagination is apparent from a comparison of material from Woodard's original interview tapes with corresponding accounts in the Work. Woodard did not merely repeat what DeVito had told him, but instead, enriched DeVito's accounts with original expression that facilitated the story-telling. Similarly, the Work purports to divulge what various characters are thinking and feeling, and neither Woodard nor DeVito were privy to those thoughts or feelings. Finally, DeVito, known for prevarication and hyperbole, tended to insert himself into situations in which he was not a participant, and this affected the Work's content. For example, the Work relates that, while on tour in England, *The Four Seasons* were approached by four members of an unknown band, who invited them to a party in Italy. According to the Work, the group dropped everything, flew to Italy, and met with the four, who turned out to be the Beatles. But upon information and belief, this story is false – although *Valli* once met the Beatles in Italy, while there on vacation, DeVito was not present; *The Four Seasons* were not on tour; and the Beatles were already famous, and well-known to Valli. DeVito fabricated an event that never occurred, and shared it with Woodard, who included it in the Work, while adding his own expressive and creative contributions. Thus, in certain respects, the Work is fiction, depicting, *inter alia*, what Woodard and/or DeVito speculated or envisioned might have occurred, or what may have been said by others, in view of events believed by DeVito to be true, or known to be untrue, but portrayed to Woodard as accurate.

40. Upon information and belief, elements of the Work's "dramatic license," particularly its fictionalized dialogue, and characterizations of the private thoughts of third parties, resulted from Woodard's anticipation that the Work might be adapted for a screenplay. Even before the Work was written, Woodard had this prospect in mind, as he explained to DeVito's brother, Nick, during an interview in November 1989, as shown in the true copy of an extract from a certified transcript of that

interview, attached as *Exhibit 14*. When Woodard informed Nick DeVito that he was working on a "full book," and had discussed the possibility of adapting it for film with DeVito, Nick said, "I'd like to see a movie," and Woodard responded with, "I'm going to see . . . you know, something like this . . . I'd just put something together and see what somebody's willing to do with it." *Exhibit 14*, at p. 3. The Work reads like a play or screenplay, rather than a biography, with DeVito's first-person narration directed to the reader/audience, against a backdrop of action scenes and dialogue.

41. Woodard's early efforts to secure an agent or publisher for the Work were unsuccessful, and, in late-1990, just weeks following his letter to Ms. Choron, Woodard's health began to deteriorate. Although never a smoker, Woodard was diagnosed with lung cancer in 1989, and in late-Fall 1990, it spread to his bones. By December 27, 1990, he was visibly ill, and by February or March 1991, he was bedridden. Finally, Woodard died on May 25, 1991, at forty-one years old, leaving Plaintiff and three children behind. He penned his own obituary, and a true copy thereof, as published in the May 27, 1991 *Beaumont Enterprise*, is attached as *Exhibit 15*. Numerous achievements are chronicled therein, including Woodard's "distinguished reputation nationwide as a journalist of classic rock and roll music," but the accomplishment of which he was most proud is summarized as follows: "In early-1991, he finished work on his most ambitious project, a full-length book, coauthored with Tommy DeVito, a member of the Rock and Roll Hall of Fame." *Exhibit 15*, at p. 2.

42. Woodard's dying wish was that Plaintiff and his sister would ensure that the Work was published after his death, and he hoped that income generated by the Work, and/or adaptations thereof, would support his wife and children. In addition to Woodard's letter agreement with DeVito, through which Plaintiff was the successor and beneficiary of Woodard's rights and interests in the Work, Woodard bequeathed to Plaintiff all of his intangible property, "of whatsoever kind and character," as shown in the redacted copy of his *Last Will and Testament*, attached as

*Exhibit 16*.

43. In accordance with Woodard's wishes, shortly following his death, Plaintiff and Woodard's sister, Cindy Woodard Ceen, resumed Woodard's efforts to find a publisher, using the form letter he had employed, but substituting their names for his, as shown in the true copies of exemplary correspondence, and the listing of publishers Plaintiff attempted to contact, attached as *Exhibit 17*. Mrs. Ceen sent approximately ten such letters to publishers. However, Plaintiff's listing was not current, and several of her letters were improperly addressed; "returned to sender;" and, did not reach the intended recipients, as shown by the true copies of the return envelopes therefor, attached as *Exhibit 18*. Plaintiff also engaged a literary agent in Montana, in the hopes of publishing the Work. However, the agent was not reputable, and whatever efforts he undertook did not succeed. Moreover, public interest in *The Four Seasons* had waned by this time, and was perceived by those few publishers who responded to be minimal. Accordingly, the Work remained unpublished, and no further steps toward publication were undertaken until September 2005.

44. On September 22, 2005, Mrs. Ceen telephoned DeVito; discussed Plaintiff's continuing desire to publish the Work, and attempted to enlist his assistance. However, although DeVito was cordial, and spoke kindly of Woodard, he indicated that changes were needed, and asked Mrs. Ceen to send him an additional copy, claiming that his copy of the Work had been lost. Mrs. Ceen promptly did so, and initially believed DeVito intended to help. However, she heard nothing further from him until early-November, 2005, when she was contacted by his attorney, who claimed that the work was "not saleable." Mrs. Ceen was surprised by this assessment, because the *Jersey Boys* play was scheduled to open on Broadway a few days later, and she believed the renewed appreciation for *The Four Seasons* engendered by the play would generate an interest in DeVito's story. Accordingly, Mrs. Ceen sent a letter to DeVito's attorney later that day, asking that he reconsider his position – in view of *Jersey Boys*, Plaintiff believed the time for publication had

arrived, and both Plaintiff and Mrs. Ceen felt DeVito's cooperation and endorsement would be beneficial, if not crucial. True copies of Mrs. Ceen's letter to DeVito, her notes from the subsequent conversation with his attorney, and her follow-up letter to DeVito's attorney, dated November 3, 2005, are attached as *Exhibit 19*. Meanwhile, Plaintiff concluded that it remained her burden to publish the Work, and continued to hope for a deal.

45. By the end of 2006, the *Jersey Boys* stage play had become a smash hit, recouped its initial investment, and garnered four Tony Awards. Although Plaintiff had not seen the show, and remained unaware of its specific content, she, in consultation with Mrs. Ceen, surmised that the production's success would give rise to demand for the Work, and decided to engage counsel to: (a) confirm that the copyright in the Work had been registered before her husband's death, on behalf of the coauthors/joint owners; (b) register the copyright on behalf of the coauthors, if no application for such registration had been filed; and, (c) contact DeVito's attorney to assess whether DeVito might again be interested in cooperating and collaborating with Plaintiff.

46. A search of the online database records of the Copyright Office conducted by Plaintiff's counsel on January 3, 2007, failed to reveal any copyright registration issued to Woodard for the Work. However, a search under the keyword, "Tommy DeVito," showed that on January 11, 1991, DeVito obtained a copyright registration for a literary work entitled, *Tommy DeVito – Then and Now*, under Reg. No. Txu 454 118. A certified copy of this registration is attached as *Exhibit 20*. Plaintiff subsequently obtained a copy of the work deposited with the application leading this registration, and found that, but for the cover page, which bore a new title, and a missing page (page 264), the deposited work was identical to the Work as written by Woodard, and typed by his secretary, Myrtle Locke.

47. In view of Woodard's primary authorship of the Work, the 1988 letter agreement between Woodard and DeVito, DeVito's awareness of Woodard's (and his

heirs') attempts to publish the Work, and the content of DeVito's attorney's conversation with Mrs. Ceen, the revelation that DeVito had registered the Work in his name without disclosing same to Woodard or Plaintiff, generated concerns. And, these concerns were heightened by near-contemporaneous discoveries that the writers of the *Jersey Boys* musical had somehow obtained access to the Work; that the Work reportedly had inspired the form, structure, and content of the musical; that the perspective of the "Tommy DeVito" character in the play was derived largely from the Work; that several scenes in the play were adapted from the Work; that the actors portraying DeVito were provided with copies of the Work; and, that DeVito might be financially connected to the musical.

48. Specifically, as shown in the true copies of published news articles attached as *Exhibit 21*, a July 8, 2006 *Reuters* report in *Backstage Magazine* quoted Des McAnuff, the director of the *Jersey Boys* play, as stating that, in writing the *libretto*, Brickman and Elice relied on interviews with Gaudio and Valli, and "***an unpublished autobiography by DeVito***," *Exhibit 21*, at p. 3 (emphasis added), for the perspectives of their characters in the show, while relying on others for Nick Massi's side of the story, given his death in December 2000. *Id.* The main *Wikipedia* article for DeVito also reported that: "DeVito has written a lengthy but as-yet-unpublished autobiography (with the help of the late Rex Woodard) about his days with the group, which served, along with other accounts, as background material for the musical." *Exhibit 21*, at p. 4. An association between *Jersey Boys* and the Work was also noted in the following "Question and Answer" exchange accompanying a December 23, 2005 *Jersey Boys* "Podcast:"

> Q.: Does anyone have any more information about 'THE BOOK' that the Jersey Boys Broadway production is based on written by Marshall Brickman and Rick Elice?
>
> A: Book is a term that refers to the script, so when they say book by Brickman and Elice they are referring to the script. ***The writers did***

> ***reference an unpublished Tommy DeVito autobiography that was provided by Tommy himself.*** This autobiography was to be, and may still be, published.

*Exhibit 21*, at p. 5 (emphasis added). And, a published interview with Christian Hoff, who first portrayed DeVito in the musical, winning a Tony Award for his performance, reported further associations. According to Hoff, when casting for the *Jersey Boys* musical began, the script had not been written, and he was provided with a one and one-half (1½) page distillation of the Work from which to audition, *Exhibit 21*, at p. 9, while the entire Work was made available as background research. *Id*.

49. Following these discoveries, relations between Plaintiff and DeVito soured, ultimately leading to the Theatrical Litigation. On June 13, 2007, Plaintiff's counsel sent a letter to DeVito's attorney, which presumed, based on news reports, that DeVito had licensed rights in the Work for *Jersey Boys*, and accordingly, owed Plaintiff, his co-owner, an accounting. Plaintiff also requested, *inter alia*, DeVito's cooperation in filing an application for Supplementary Registration with the Copyright Office, to correct Reg. No. Txu 454 118, by adding Woodard as a coauthor and copyright co-claimant. A true copy of this letter is attached as *Exhibit 22*. DeVito's attorney did not respond in writing to this demand, but counsel spoke repeatedly by telephone, and exchanged electronic mail messages, between June and October 2007, in an attempt to reach an amicable resolution. These communications were not fruitful, and further eroded the relationship between the parties, as DeVito's attorney was uncooperative, and advanced seemingly inconsistent assertions, initially claiming DeVito had not licensed the Work for the *Jersey Boys* musical, but later admitting DeVito had shown the Work to someone connected to the play, without providing further details. Years later, Plaintiff would learn that both assertions were true. However, at the time, they engendered mistrust, particularly given DeVito's attorney's refusal to elaborate; to provide copies of any agreements DeVito may have executed relating to the play; or, to cooperate with Plaintiff in supplementing and

correcting Reg. No. Txu 454 118. Accordingly, Plaintiff prepared for litigation.

50. On July 2, 2007, following the initial talks with DeVito's counsel, Plaintiff unilaterally filed an application for Supplementary Registration with the Copyright Office, seeking to supplement and correct Reg. No. Txu 454 118, to include Woodard's authorship and ownership claims. This application ultimately was granted, and a *Certificate of Supplementary Registration* was issued to Plaintiff for the Work, under Reg. No. Txu1 372-636, dated July 3, 2007, as shown in the true copy of the *Certificate* attached as *Exhibit 23*.

51. As negotiations with DeVito's attorney concluded unproductively in October 2007, additional facts emerged concerning connections between the Work and *Jersey Boys*. First, as shown in *Exhibit 21*, at p. 22, a September 30, 2007 article in the *Chicago Tribune* included the following account of the writing of the musical:

> Drafts passed back and forth. Faced with the conflicting recollection of the surviving Seasons, Elice and Brickman hit on the politically savvy idea of using all three of them as narrators, each telling their version of the group's history at different points in the show. ***As it happened, DeVito already was writing a memoir, which provided a lot of material, especially on how the Seasons tap-danced around the Outfit members who controlled many of the venues in which they played, and whose loans underwrote DeVito's lifestyle***.

*Id*. (emphasis added). Then, in late-October 2007, Broadway Books, a division of Random House, released an "official" publication authored by David Cote, entitled, *Jersey Boys The Story of Frankie Valli and the Four Seasons* (the "Jersey Boys book"), which provided further details. True copies of representative pages from this book are attached as *Exhibit 24*. Among the 177 pages thereof were first-hand accounts from the writers and directors of the play, concerning the evolution of the *libretto*. As recounted therein, the initial treatment by writers Brickman and Elice was largely fictional, and did not appeal to director, Des McAnuff, when he was first

approached to direct the play:

> DES McANUFF: Michael [David] approached me [about Jersey Boys] and he was very excited but thought it needed work. And, quite frankly – and I mean this in no way as an insult to Marshall [Brickman] and Rick [Elice], who've done a spectacular job of writing this thing – <u>the initial treatment wasn't of any interest to me. It was fictionalized. There was some biographical information there, but it was largely invention, a traditional musical structure, with people on the street bursting into song, and a bunch of girls as a Greek chorus of Jersey Girls. It didn't grab me. I felt that Nick and Tommy were indistinguishable; the story focused too much on Bob and Frankie and, quite frankly, it sentimentalized them</u>. It didn't appeal to me . . . . I met with them and heard what they had to say, and then I basically told them that it wasn't for me. Finished lunch, shook hands, thought that would be the end of it.

*Exhibit 24* at p. 3 (emphasis added). However, the tide turned for McAnuff, according to the *Jersey Boys book*, when he read the Work and two interviews with Valli and Gaudio, and was struck with the concept of a biographically-inspired production that would be narrated by the members of *The Four Seasons*, with each providing his personal perspectives on the group:

> DES McANUFF: [T]he really important documents were two long interviews with Frankie and Bob, which were meant to be deep background for a TV movie. ***There was also an unpublished autobiography by Tommy DeVito that is beyond description. It was just so delicious. Rick and Marshall had a couple of sequences in their treatment that were clearly inspired by this autobiography***.
>
> MARSHALL BRICKMAN: <u>We hadn't at that point realized that we wanted to do a biography</u>. We just didn't want to do a kind of retrofitting

of songs to a preconceived plot, like Mamma Mia!

*Exhibit 24*, at p. 4 (emphasis added). The "sequences" referenced in McAnuff's foregoing statement, that were "clearly inspired" by Woodard's "really important" and "delicious" unpublished Work, were contained in an early, rough treatment for the play, written by Brickman and Elice in February 2004, which drew from, and/or referenced, the earlier, fictionalized treatment, entitled, "Oh What a Night!," but drew far more heavily from the Work, from which it copied dialogue and other passages *verbatim*. After reading the Work and reviewing this treatment, McAnuff purportedly agreed to direct the play, and the transformation of "Oh What a Night!" into *Jersey Boys* commenced, though the details concerning that transformation would not become known to Plaintiff for several more years, as principal discovery in the Theatrical Litigation concluded.

52. On December 28, 2007, Plaintiff sued DeVito in the Eastern District of Texas, under Civil Action No. 1:07cv985, seeking, *inter alia*, a declaratory judgment regarding Woodard's co-authorship of the Work; an equitable accounting from DeVito of any profits he had realized from the use or licensing thereof; and, damages for breach of the 1988 letter agreement between Woodard and DeVito, again based on news reports inferring that DeVito had authorized the use of the Work for the play. At that point, however, Plaintiff was still unaware of the nature of DeVito's suspected license to use and adapt the Work for the *Jersey Boys* play, if any; the nature, extent, and origin of DeVito's financial interest in the production; or, the precise manner in which the Work had been used for the play. Some information was obtained from the initial disclosures in the case, but shortly thereafter, on May 19, 2008, the lawsuit was transferred to the District of Nevada.

53. Plaintiff's questions were answered in July 2008, as the transfer of the Theatrical Litigation to Nevada was underway, following a review of certain documents made public in Defendant Valli's divorce proceeding in Los Angeles, true copies of which, redacted to obscure personal addresses, are attached as *Exhibit 25*.

As shown in *Exhibit 25*, at pp. 38-41, on or about August 13, 1999, DeVito entered into the *1999 Agreement* with Defendants Valli and Gaudio, through which he purportedly issued an exclusive, irrevocable, perpetual, worldwide, assignable license thereto, to use, adapt, change, fictionalize, and otherwise modify, as they saw fit, certain "Materials," including his "***biographies***," for the purpose of creating a musical stage play based on the "life and music" of *The Four Seasons*. The transfer not only encompassed the exclusive right to use and adapt the Work for "theatrical productions," but also conveyed exclusive rights in "all ancillary and subsidiary exploitations thereof including, without limitation, cast albums, ***motion picture and televised versions***, merchandise, and/or other works . . . ." *Id*., at pp. 39-40 (emphasis added). In consideration for this "exclusive license," the *1999 Agreement* provided that DeVito would be paid a portion of the royalties accorded to Defendants Valli and Gaudio for the "underlying rights" in the prospective play.

54. As shown in *Exhibit 25*, the *1999 Agreement* was attached as "Exhibit A" to the main production agreement for the *Jersey Boys* play, *id.* at 38, between Defendants Gaudio, Valli, Brickman, and Elice, and Dodger Stage Holding Theatricals, Inc. ("DSHT"), identified as "Producer," which was dated "as of May 1, 2004," though discovery in the Theatrical Litigation revealed that it was not actually executed until October 3, 2005. Moreover, Section 4 of the production agreement ostensibly included an assignment from Valli and Gaudio, to DSHT, of the rights obtained from DeVito through the *1999 Agreement*, as follows:

> **Other Participants.** Owner represents that it owns and controls the rights in and to the name "The Four Seasons," the individual life stories of Frankie Valli and Robert Gaudio, and the story of the Group itself, except for the rights in and to the life stories of Nick Macioci and Tom DeVito (the "Third Parties"). ***Owner agrees that it shall enter into separate agreements with the Third Parties, in substantially the form attached hereto as Exhibit A, pursuant to which Owner shall acquire***

> ***all necessary rights (the "Third Party Rights") from the Third Parties to allow Producer to exercise all of the rights in and to the Play granted herein***, including, but not limited to, all live stage production rights and all Subsidiary Rights granted to Producer herein, ***and Owner agrees to assign to Producer, for no additional consideration, the Third Party Rights*** . . . .

*Exhibit 25* at pp. 4-5. Section 6 of the production agreement further provided that all live stage musical rights in the DeVito (and other "Third Party") rights transferred thereunder, would be merged exclusively with the play, "if the play runs for six months or more in a Broadway or West End Theater." *Id*. at p. 5. And, under the *1999 Agreement*, if such a merger occurred under an eligible production agreement, DeVito's grant of rights would continue in perpetuity.

55. Although the *1999 Agreement* was cast as "irrevocable," and "not subject to recission," *Exhibit 25* at p. 40, it also included a "reversionary clause," expressly sought by DeVito, and negotiated by the parties, reading as follows:

> ***If the rights of the initial commercial producer lapse prior to merger, and we enter into a production contract with another commercial producer within two (2) years*** following such lapse of rights, ***our rights hereunder shall continue only for the duration of such subsequent producer's rights***, and in perpetuity if merger has occurred pursuant to our production contract with such subsequent producer.

*Exhibit 25*, at p. 40.

56. Upon reviewing the *1999 Agreement*, the production agreement with DSHT, and other documents obtained through Valli's divorce proceeding and the Theatrical Litigation, Plaintiff noted several problems. First, a copyright co-owner cannot grant an "exclusive license," as a matter of law – a co-owner may issue nonexclusive licenses, or assign his own rights in a copyrighted work, but cannot issue "exclusive licenses," because such licenses would bind his other co-owner(s).

Second, the reversionary clause in the *1999 Agreement* appeared to have been triggered. DSHT was not the "initial producer" of the play – an identical production agreement had been executed in 1999 with "Metropolitan Entertainment Group," and had "lapsed prior to merger" on December 10, 2002, meaning that Valli and Gaudio were required to enter a contract with another commercial producer by December 10, 2004, at the latest, or the *1999 Agreement* would lapse, under its terms, and the rights conveyed therein would revert to DeVito. The production agreement with DSHT, though dated "as of May 2004," was executed in October 2005, almost a year following the applicable deadline. And, DSHT was no longer the producer of *Jersey Boys* by that date, and, in fact, never brought the play to Broadway or the West End. DSHT was succeeded as producer by Dodger Theatricals, Ltd., and not even Dodger Theatricals was the producer by the time *Jersey Boys* premiered in New York – the ultimate producer was "Jersey Boys Broadway Limited Partnership." Based on this information, Plaintiff expanded the Theatrical Litigation, filing an amended complaint joining Valli, Gaudio, Brickman, Elice, DSHT, Des McAnuff, Dodger Theatricals, Jersey Boys Broadway Limited Partnership, and others, as defendants, and modifying her claims against DeVito.

57. An interim appeal in the Theatrical Litigation, in which Plaintiff prevailed before the Ninth Circuit, and later proceedings before the District of Nevada on remand, resolved these issues, and left the *1999 Agreement* with no relevant residual effect. First, the Ninth Circuit confirmed, as Plaintiff had argued, that the *1999 Agreement* unambiguously covered the Work, through its inclusion of "biographies" in the definition of the "Materials" conveyed. *Corbello v. DeVito*, 777 F.3d 1058, 1063 (9th Cir. 2015). Second, the Ninth Circuit confirmed that a copyright co-owner cannot grant an exclusive license in a co-owned work, but *can* assign his own interest, and found that the *1999 Agreement* was an assignment from DeVito, to Valli and Gaudio, of DeVito's undivided interest in the exclusive right to prepare certain derivative works based on the Work, making Valli and Gaudio co-owners of

that right with Plaintiff. *Id.*, at 1064. Finally, the Ninth Circuit found a material issue of fact regarding whether the reversionary clause in the *1999 Agreement* terminated Valli's and Gaudio's ownership rights, resulting in the defendants' infringement of Plaintiff's copyright interest in the Work. *Id.*, at 1066. And at trial, following the Ninth Circuit *Mandate*, all parties to the *1999 Agreement*, and the "May 1, 2004" production agreement, stipulated and agreed that the *1999 Agreement* lapsed on December 10, 2004, and the rights therein conveyed to Valli and Gaudio reverted to DeVito on that date, as shown in the true copies of these stipulations, attached as *Exhibit 26*.

58. During the Theatrical Litigation, other revelations followed concerning the manner in which the Work came to be used, and how it was used for the *Jersey Boys* play. Specifically, during a brief conversation between DeVito and Defendant Brickman, before *Jersey Boys* was written, DeVito expressed concerns regarding the play's portrayal of mobster and close friend, Ray "Gyp" DeCarlo, as he did not want DeCarlo depicted as the murderous gangster that he was. Accordingly, DeVito informed Brickman of the Work, and offered to lend him a copy so he could "flip through it" for information about DeCarlo's relationship with DeVito and his family. However, this offer was subject to strict conditions, including that Brickman use the Work only for background information about DeCarlo; that he return the Work to DeVito right away, without making copies; and, that he not show the Work to anyone else, including Elice. Brickman did not abide by these instructions. When he received the Work from DeVito, he first gave it to Elice, who made two copies, keeping one, giving director McAnuff the other, and returning the original to Brickman, so he could send it back to DeVito immediately, keeping DeVito unaware of this copying and dissemination. And on February 6, 2004, Brickman sent an email to Jim Roderick, director Des McAnuff's assistant, as shown in the true copy thereof, attached as *Exhibit 27*, demonstrating that he knew he was violating DeVito's instructions. The message read:

> ***[T]here's a 300 p. typescript of an unpublished memoir of Tommy deVito*** ***<u>& someone else</u>*** ***given to us by Tommy with the request that it not be circulated.*** Des [McAnuff] has a copy. ***On Monday we'll see about duplicating it . . . .***

*Exhibit 27*, at p. 2 (emphasis added). Pursuant to this message, copies of he Work ultimately were made and distributed to the producer of the play, the dramaturge, the choreographer, the music director, the actors playing DeVito in the numerous productions of the play, and other members of the production team, and portions of the Work were performed at live table readings for the cast, and included in production notebooks. Meanwhile, the *Jersey Boys* writers, Defendants Brickman and Elice, together with director McAnuff, began massively appropriating material from the Work for the play.

59. Specifically, one or two days before Brickman received a copy of the Work from DeVito, McAnuff scheduled the inaugural planning meeting for the play, which was to consist of spending a day in front of a bulletin board with index cards, to select material, and begin constructing an outline for the musical. In preparation for that meeting, McAnuff gave specific assignments to each writer. Brickman was charged with preparing a compendium of preexisting notes, while Elice was assigned the task of reviewing and copying from the Work. The plan was to transfer this material to index cards; organize the cards on a whiteboard during the meeting; and, over the course of the meeting, select those cards that would be used for the play. Pursuant to his assignment, Elice reviewed the copy of the Work he had made for himself, marked almost 100 pages of its text, highlighting, circling, and bracketing passages of interest, and wrote notes in the margins, such as "*That's a scene!,*" "*Scene*," "*Nick Scene*," and "*Scene in jail.*" He also copied passages from the Work, *verbatim*, onto index cards for use in the bulletin board meeting with Brickman and McAnuff; the cards were used at the meeting to organize and structure the play; none of the cards were marked to indicate the source of its content; and, at the conclusion

of the meeting, the cards were placed into two piles – the "discards" and the "keeps for the moment" – and Elice and Brickman referred to the "keeps," and discussed them with McAnuff, while outlining and drafting the play.

60. The result of this process was that the Work dominated the early outlines, treatments, draft scripts, and final production scripts for the *Jersey Boys* play. The "first scene idea for Marshall" that Defendant Elice drafted for *Jersey Boys*, and presented to Brickman on or before January 28, 2004, included *verbatim* copying and close paraphrasing from the Work, and such material continued to appear in every outline and draft script for the play thereafter, and in the final performance scripts. Richard Krevolin, Plaintiff's expert in the Theatrical Litigation, who authored a book entitled, "How to Adapt Anything into a Screenplay," and has extensive expertise in the art of adaptation, conducted a comprehensive review of all major outlines, draft scripts, and final scripts for the play, traced the use of the Work throughout the *Jersey Boys* writing process, and prepared a 166-page report on his findings, which identified numerous objective similarities between the Work and the play, including *verbatim* copying, close paraphrasing, and objective similarities in plot, themes, dialogue, mood, setting, characters, and the selection and sequencing of events, and a true copy of that report is attached as *Exhibit 28*.

61. On July 14, 2005, prior to the Theatrical Litigation, and months before *Jersey Boys*' Broadway debut, Defendant Elice sent an email to journalist, Charles Alexander, in response to Alexander's inquiry about the Work, as shown in the true copy of that message, produced by Alexander in response to a subpoena, and attached as *Exhibit 29*, in which Elice credited the Work with providing the "guiding premise" for *Jersey Boys*, and acknowledged that the Work was not written by DeVito:

> **The unpublished book of which you speak is a manuscript written by Tommy Devito with another individual (who probably did most of the "writing")** . . . Much of what was mentioned in that book was questioned and challenged by Bob/Frankie. **The book was useful as a**

> **source of a particular perspective (Tommy's)** with which Frankie (and usually Bob) took constant issue, ***and therefore gave us (Marshall and me) our point-of-view, and the guiding premise for the entire musical, which we set forth, through Tommy's mouth, at the top of the show "Ask four guys what happened, you get seventeen different versions."***

*Exhibit 29*, at p. 2. Elice closed the email by stating, falsely, that "[r]egrettably, the manuscript was returned to Tommy sometime ago," *id*., when in fact, he kept his copy, and, years later, produced it in the Theatrical Litigation. Evidence in the Theatrical Litigation also showed that Defendant Gaudio was aware of the writer's use of the Work, including: (a) testimony, in Defendant Valli's 2006 divorce proceeding, that the writers had the Work – which Gaudio referred to as a "novel" – "at their disposal" when writing the play, and (b) a July 2005 interview with Charles Alexander, in which Gaudio acknowledged that he knew DeVito had a "ghost writer," who actually wrote the Work.

62. The trial in the Theatrical Litigation was bifurcated, and the liability phase was conducted between October 31, 2017 and November 28, 2017, resulting in a unanimous jury verdict in Plaintiff's favor, that: (a) the *Jersey Boys* play infringes Plaintiff's copyright in the unpublished Work; (b) DeVito did not grant the defendants an implied license to use the Work; (c) the defendants' use of the work did not constitute fair use; and, (d) 10% of the success of *Jersey Boys* was directly attributable to the defendants' infringements, as shown in the true copy of the redacted verdict form, attached as *Exhibit 30*. However, on June 14, 2017, the District Court vacated the jury verdict, and entered *Judgment* for the defendants. On June 26, 2017, Plaintiff appealed that ruling to the Ninth Circuit, under Appeal No. 17-16337.

63. On October 6, 2010, while the Theatrical Litigation was pending, numerous news organizations reported that Defendant GK Films had acquired the rights to adapt the *Jersey Boys* play for film, as shown in the exemplary article from

*Variety*, attached as *Exhibit 30*. Whereas, this was concerning to Plaintiff, given the Work's significance for the play, Plaintiff served a subpoena on GK Films in the Theatrical Litigation, requesting copies of any and all such agreements, and correspondence relating thereto. GK Films responded and objected to Plaintiff's subpoena, through counsel, on November 9, 2010, and as shown in the transmittal letter accompanying its responses and objections, a true copy of which is attached as *Exhibit 32*, claimed there was no "legally binding agreement" for a *Jersey Boys* film:

> Again, to confirm our recent telephone conversation, ***GK Films does not have a legally binding agreement to purchase the film rights to the Broadway production*** that is the subject of your lawsuit. ***My client was in the process of attempting to negotiate a deal, but has ceased negotiations in light of your client's litigation with the defendants. This litigation now makes it impossible for GK Films to proceed with a movie, based on the Broadway production, as it would be unable to secure adequate insurance or a studio distributor***.

*Exhibit 32*, at p. 2 (emphasis added).

64. Plaintiff had no reason to doubt this representation in 2010, and accordingly assumed there would be no cinematic version of *Jersey Boys* unless and until the Theatrical Litigation was resolved. However, upon information and belief, while perhaps technically true, the representation from GK Films recounted in Paragraph 63 was misleading, as Defendant WAGW, a company led by Graham King, GK Films' chief executive, and co-located with GK Films in the same office, *had* entered an agreement with Brickman and Elice, the writers of the *Jersey Boys* play, on or around October 4, 2010, through which Brickman and Elice assigned their rights in the *Jersey Boys libretto* to WAGW for purposes of the film, and agreed to write the screenplay for the *Jersey Boys Movie*, through their respective "loan out" companies, Defendants Hedgehog and Getting Home, on a "work for hire" basis, with WAGW as the "employer for hire" and copyright owner. Moreover, upon information

and belief, this agreement was honored; the commissioned screenplay was produced; and WAGW subsequently assigned the rights obtained from Brickman and Elice thereunder, to Defendant Warner Bros. Entertainment, notwithstanding the Theatrical Litigation, as shown in the extract from the online database records of the Copyright Office attached as *Exhibit 33*. At a minimum, GK Films' November 9, 2010 correspondence, demonstrates that it had notice of Plaintiff's claims, and knew that if a film version of *Jersey Boys* were produced that included the same infringing material which permeates the play, a lawsuit by Plaintiff would likely follow.

65. Upon information and belief, the *Jersey Boys Movie* experienced other delays and difficulties, which may or may not have arisen from Plaintiff's claims in the Theatrical Litigation, but in which Defendant GK Films played a continuing role. For example, in January 2012, it was widely reported that *Gladiator* screenwriter, John Logan, had been hired by GK Films to write the *Jersey Boys Movie* screenplay, which, if true, would mean Brickman and Elice had been discharged. A true copy of an exemplary news article concerning this development, is attached as *Exhibit 34*. And in November 2012, it was reported that Warner Bros. had placed the *Jersey Boys Movie* in "turnaround," and was no longer interested in the project, as shown in the true copy of an exemplary article from *Variety*, dated November 1, 2012, and attached as *Exhibit 35*. The same article identified Jon Favreau as the director, but Favreau did not ultimately direct the film. *Id*. In late-March 2013, it was rumored that Clint Eastwood was in talks to direct, initially using the John Logan screenplay, as shown in the exemplary article from the *Hollywood Reporter*, attached as *Exhibit 36*. But upon information and belief, by later that year, the project was back at Warner Bros., Brickman and Elice were the screenwriters, and Clint Eastwood was confirmed as director.

66. Upon information and belief, the foundational agreement for the *Jersey Boys Movie* – a "Purchase Agreement," signed on August 23, 2013, but made effective as of June 3, 2013 – is between Defendants Warner Bros. Pictures, WB

Studio Enterprises, Inc., Valli, Gaudio, Getting Home (for Elice), Marshall Brickman, and Warner Bros. Entertainment. DeVito was not a party. Moreover, while Valli and Gaudio conveyed their own life story rights therein for the film, the biographical rights for DeVito (and Nick Massi) were solely those specified in the lapsed *1999 Agreement*, which, in Section 2(d)(iii) of the Purchase Agreement, are ostensibly assigned by Valli and Gaudio to Warner Bros., with a representation that Valli's and Gaudio's rights under the *1999 Agreement* "represent the entirety of the rights Owner (Valli/Gaudio) possesses from Tommy DeVito and Nick Macioci." Whereas, the *1999 Agreement* lapsed in December 2004, and Valli and Gaudio have stipulated and agreed that the rights therein conveyed reverted to DeVito (and Massi) almost nine years before the *Jersey Boys Movie* Purchase Agreement was executed, this 2013 transfer by Valli and Gaudio was void, *ab initio*, and none of the Warner Bros. defendants hold, or ever held, any rights to use, copy, paraphrase from, or adapt the Work for the film, and the "assignment" from Valli and Gaudio, and any subsequent assignment(s), license(s), or sublicense(s) thereunder, were infringements of Plaintiff's (and DeVito's) exclusive right, under 17 U.S.C. § 106, to authorize, and exercise, the remaining rights enumerated therein.

67. Similarly, Defendants Elice, Getting Home, Brickman, and Hedgehog, had no rights to "assign" infringing components of the *Jersey Boys libretto* to Defendant WAGW, through the "October 4, 2010" "Writer Loanout Agreement," or to include such components in any screenplay for the *Jersey Boys Movie*; WAGW had no right to further assign such components to Defendant Warner Bros. Entertainment; and Warner Bros. had no right to include them in the film.

68. Upon information and belief, the Purchase Agreement for the *Jersey Boys Movie* also establishes that Defendants Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Entertainment, and their affiliates, were on notice, and aware of, Plaintiff's copyright claims when the agreement was executed. For example, Sections 5(a) and 5(b) of the Purchase Agreement, which consist of representations

and warranties from Defendants Brickman, Elice, Valli, and Gaudio, that the materials conveyed are original, and do not infringe the copyrights of others, prominently include the following qualifier: "**excluding the *Corbello v. DeVito et al.*, pending in the U.S. Court of Appeals, Ninth Circuit ["Corbello Litigation"].**" Thus, the conveying Defendants, the receiving Warner Bros. Defendants, and Defendant WAGW, willfully and intentionally decided to proceed with the film at their risk.

69. The *Jersey Boys Movie* was released in the United States on June 20, 2014, following a premiere at the Los Angeles Film Festival on June 19, 2014, and was released in at least sixty countries abroad, between June 5, 2014 (Australia) and April 19, 2015 (China). Upon information and belief, and as shown in the true copy of an article published in *Playbill* on September 3, 2014, attached as *Exhibit 37*, the *Jersey Boys Movie* was released to the home video market on or about November 11, 2014, in DVD and Blu-ray formats, and was made available for purchase through pay-per-view, "on-demand," and streaming services on that date, including Amazon.com, CinemaNow, Flixter, iTunes, Playstation, Target Ticket, Vudu, Xbox, and others. The *Jersey Boys Movie* was also distributed digitally through Video on Demand services from cable and satellite providers, and on select gaming consoles. *Exhibit 37* at 2. Finally, upon information and belief, the film has aired on HBO, and other cable and/or satellite networks. Although Plaintiff first saw the film in late-June 2017, she became aware that it included infringing content on June 24, 2014.

70. *The Jersey Boys Movie*, as released, still contains protectable expression from the Work, and material viewed as infringing the Work by a unanimous jury in the Theatrical Litigation. Most significantly, it retains, with only minor modification, the studio dialogue for the scene in which *The Four Seasons* record their third hit, "Walk Like a Man." This dialogue, which appears on page 124 of the Work, is entirely the product of Woodard's literary imagination, and was not a "real conversation" among the band members. In the recorded interview with DeVito, in

which he discusses the song, DeVito indicated only that he loved the music, but did not care for or understand the lyrics. From that generality, Woodard invented the following dialogue for the Work:

> ***"What's the name of your new hit, Bobby?***"
>
> "Walk Like A Man."
>
> ***"'Walk Like A Man?' As opposed to what - like a woman?"***
>
> "No, ***no,"*** explains Gaudio defensively, ***"the song is directed to teenage boys who need to walk and talk like men.***"
>
> "In other words, ***instead of like girls."***
>
> ***"No! Instead of like boys. This song is going to serve as an anthem for every teenage boy who has let some girl twist him around her little finger!"***

And, in the *Jersey Boys Movie*, the following exchange takes place in the same "scene," serving the same intrinsic purpose:

> "***What don't you get, Tommy?***
>
> "The title, ***'Walk Like a Man.'"***
>
> "So?"
>
> ***"As opposed to what, a woman?"***
>
> "***No, it's for boys, Tommy."***
>
> ***"Teenage boys. We're telling them to act like men."***
>
> ***"Instead of like girls?***"
>
> "Yeah, instead of like – ***No! Instead of like boys***. Come on. Why are you doing this?"
>
> "Hey, hey, hey! Miss Congeniality. It's a metaphor. ***It's an anthem for every guy who's ever been twisted around a girl's little finger.***"

This is *verbatim* copying, and an infringement of Plaintiff's rights in the Work. It is also an important scene in the film, and is highlighted in the first "extra" feature on the Blu-ray version thereof. Moreover, this is not the only example. In fact, a

comparison of the condensed list of objective similarities between the Work and the Broadway production of *Jersey Boys*, appearing in Richard Krevolin's expert report, and numbered in the left margin for convenience in *Exhibit 28*, at pp. 63-71, with the similarities between the Work and the *Jersey Boys Movie*, shows that at least the following numbered similarities are as applicable to the film as to the play: 1, 3, 6, 7, 8, 9, 11, 12, 13, 18, 19, 20, 21, 26, 29, 30, 31, 35, 37, 38, 40, 44, 46, 50, 52, 53, 54. 56, 62, 63, 64, 65, 66, 68, 72, 73, 74, 79, 82, 83, 88, 89. Mr. Krevolin's analyses of similarities in plot, themes, dialogue, mood, setting, pace, characters, and the selection, sequencing, and ordering of events are also equally applicable to the play and the movie. In sum, the *Jersey Boys Movie*, like the *Jersey Boys* play, is an infringing work, and, at least in part, a derivative work based on the Work.

71. Defendants, unless enjoined, will continue their unlawful and infringing conduct, and Plaintiff has no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**

**(Copyright Infringement)**

*(Against Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, Warner Home Video, and Malpaso Productions)*

72. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 71 hereinabove, as if more fully set forth in this Paragraph 72.

73. The Work is a "joint work" under 17 U.S.C. § 101, which contains large amounts of material that is wholly original to its co-authors, Woodard and DeVito, and constitutes copyrightable subject matter under the laws of the United States. As co-author of the Work, Woodard held an indivisible fifty (50%) percent share of the copyright therein, including an equal share in any material which may have originated from DeVito, and Woodard's ownership interest passed to Plaintiff upon his death.

74. U.S. Copyright Reg. No. Txu 454 118 for the Work, dated January 11,

1991, and shown in *Exhibit 20* hereof, was held by DeVito in constructive trust for Plaintiff, as co-owner, and Plaintiff is entitled to the rights, benefits, protections, and remedies accorded by the Copyright Act thereunder. Said registration issued years before the infringing conduct complained of herein, and the prerequisites and formalities of 17 U.S.C. § 411 have been satisfied. Whereas, Plaintiff is a legal and/or beneficial owner of the copyright embodied in U.S. Reg. No. Txu 454 118, she has standing to bring this action for copyright infringement against the above-named Defendants under 17 U.S.C. § 501(b).

75. Plaintiff also has standing to bring this action for copyright infringement against the above-named Defendants under 17 U.S.C. § 411(a)-(b), by virtue of *Supplementary Registration* No. Txu1 372 636, issued on July 3, 2007, and shown in *Exhibit 23* hereof, which supplements U.S. Reg. No. Txu 454 118 to include Woodard's claims of authorship and ownership.

76. *The Jersey Boys Movie* is a derivative work based on the Work, under 17 U.S.C. § 101, as it is a dramatization, fictionalization, abridgment, condensation, or other recasting, transformation, or adaptation of the Work.

77. Defendants and/or their principals had extensive access to the Work, and several enjoyed such access for more than ten years before the *Jersey Boys Movie* was released, and pursuant to the inverse ratio rule in this Circuit, less similarity between the Work and *Jersey Boys* is required to establish "copying" than would be required if said Defendants had less access to the Work.

78. *Jersey Boys* is substantially similar to the Work, extrinsically and intrinsically.

79. *Jersey Boys* includes passages copied *verbatim* from the Work, and passages closely paraphrased from the Work, and the selection, sequencing, and ordering of the events portrayed in *Jersey Boys* were appropriated from the Work.

80. Plaintiff has not authorized any of the above-named Defendants to prepare derivative works based on the Work; to otherwise appropriate material from

the Work for any purpose, or authorize others to do so; to reproduce the Work; to perform the Work, or portions thereof, or to distribute derivative works based upon it.

81. Defendants Valli, Gaudio, Brickman, Elice, King, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, and WB Studio Enterprises, have infringed Plaintiff's copyright in the Work, under 17 U.S.C. § 501(a), by their exercise of exclusive rights therein that are reserved to authors and copyright owners under 17 U.S.C. § 106, and held, indivisibly, by Plaintiff and DeVito, as co-owners thereof, including the authorization of others to prepare derivative works based on the Work, or on the *libretto* for the *Jersey Boys* play, which was an infringing derivative Work based on the Work.

82. Defendants Valli, Gaudio, Brickman, Elice, Eastwood, Lorenz, Malpaso Productions, and Warner Home Video have infringed Plaintiff's copyright in the Work, under 17 U.S.C. § 501(a), by their exercise of exclusive rights in the Work that are reserved to authors and copyright owners under 17 U.S.C. § 106, and held, indivisibly, by Plaintiff and DeVito, as co-owners thereof, including the preparation and production of derivative works based on the Work, and/or the preparation and production of works containing protected expression therefrom.

83. Defendants Brickman and Elice have infringed Plaintiff's copyright in the Work, under 17 U.S.C. § 501(a), through the direct copying, close paraphrasing, and adaptation of the Work's protected expression for the *Jersey Boys Movie*.

84. Defendants Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, d/b/a Warner Bros. Pictures Domestic Distribution, and Warner Home Video have infringed Plaintiff's copyright in the Work, under 17 U.S.C. § 501(a), by the distribution of copies of the infringing *Jersey Boys Movie* in various media of expression, by sale, rental, lease, or lending, and by the licensing of rights to distribute and perform same, in movie theaters; on television, including cable,

satellite, pay-per-view, broadcast, and "on demand" television services; through home video distribution channels, including DVD, Blu-ray, streaming media, digital pay-per-view, and gaming consoles.

85. If Defendants' foregoing activities continue, Plaintiff will suffer irreparable harm of an ongoing nature for which there is no plain, speedy or adequate remedy at law, and Defendants' acts of copyright infringement will continue unless they are enjoined from further committing such wrongful acts.

86. By reason of the foregoing willful infringements of copyright, Plaintiff has sustained injury, loss, and damage to her ownership rights, and Defendants have unlawfully, unfairly and wrongfully derived, and will continue to derive, income from these infringing acts, and are being unjustly enriched by these infringements.

87. Plaintiff has been damaged by said Defendants' acts in an amount not yet ascertained but to be proven at trial.

88. Defendants' aforesaid infringing acts were have been performed with knowledge of Plaintiff's copyright, and were performed intentionally and willfully.

89. Plaintiff is entitled to injunctive relief against Defendants for their acts of infringement, as provided in 17 U.S.C. § 502; namely to preliminary and permanent injunctions preventing Defendants, their officers, partners, agents, servants, employees, and attorneys, and all those acting in concert or participation therewith, from directly or indirectly copying and/or distributing the Work; preparing derivative works based on the Work; performing the Work, in whole or in part, distributing and performing derivative works based upon the Work, or works including protected expression therefrom; and/or authorizing others to engage in such activities.

90. Plaintiff is further entitled to recover from Defendants actual damages and any additional profits of these infringers, under 17 U.S.C. § 504(b); statutory damages in lieu of actual damages, under 17 U.S.C. § 504(c); enhanced damages for Defendants' willful infringements, under 17 U.S.C. § 504(d); and, to Plaintiff's

attorneys' fees and the costs of this action, under 17 U.S.C. § 505. Plaintiff also is entitled to an Order allowing for the impoundment and destruction of any and all infringing articles, under 17 U.S.C. § 503.

**SECOND CLAIM FOR RELIEF**

**(Contributory Copyright Infringement)**

*(Against Defendants Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, Warner Bros. Pictures International, Warner Bros. Distributing, Warner Home Video, RatPac Entertainment, RatPac-Dune Entertainment, RatPac Access Entertainment, and Malpaso Productions)*

91. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 71, and 73 through 88 hereinabove, as if more fully set forth in this Paragraph 91.

92. Defendants Valli, Gaudio, Brickman, and Elice, were aware, and/or should reasonably have been aware, that DeVito, whom they well know, was not the sole author of the Work, or the sole owner of the copyright therein, and upon information and belief, said Defendants were also aware of Woodard's primary authorship thereof.

93. Notwithstanding the above-named Defendants' knowledge of the infringing activities complained of herein, each induced, caused, or materially contributed to the infringing conduct of others, and are therefore liable to Plaintiff as contributory copyright infringers.

94. Defendants' foregoing activities were willful, and committed with the intent to commercially exploit the Work, in which they have no legal or proprietary rights.

95. If Defendants' foregoing activities continue, Plaintiff will suffer irreparable harm of a continuing nature for which there is no plain, speedy or adequate remedy at law, and Defendants' acts of copyright infringement will continue

unless they are enjoined from further committing such wrongful acts.

96. By reason of the foregoing willful acts of contributory infringement, Plaintiff has sustained injury, loss, and damage to her ownership rights, and Defendants have unlawfully, unfairly and wrongfully derived, and will continue to derive, income from these infringing acts, and are being unjustly enriched thereby.

97. Plaintiff has been damaged by said Defendants' acts in an amount not yet ascertained but to be proven at trial.

98. Plaintiff is entitled to injunctive relief against the above-named Defendants for their acts of contributory infringement, as provided in 17 U.S.C. § 502; namely to preliminary and permanent injunctions preventing said Defendants, their officers, agents, servants, employees, and attorneys, and all those acting in concert or participation therewith, from directly or indirectly copying and distributing the Work; preparing derivative works based upon or adapted from the Work; performing the Work, in whole or part; performing or distributing derivative works based upon the Work, or works containing protected expression therefrom; and/or authorizing others to engage in such activities.

99. Plaintiff is further entitled to recover from Defendants actual damages and any profits resulting from the infringements, under 17 U.S.C. § 504(b); statutory damages in lieu of actual damages, under 17 U.S.C. § 504(c); enhanced damages for the willfulness of said Defendants' infringements, under 17 U.S.C. § 504(d); and, Plaintiff's attorneys' fees and the costs of this action, under 17 U.S.C. § 505. Finally, Plaintiff is entitled to an Order allowing for the impoundment and destruction of any and all infringing articles, under 17 U.S.C. § 503.

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Vicarious Copyright Infringement)**

*(Against Defendants Valli, Gaudio, Brickman, Elice, King, Eastwood, Lorenz, Getting Home, Hedgehog, GK Films, WAGW, Warner Bros. Entertainment, Warner Bros. Pictures, WB Studio Enterprises, RatPac Entertainment, RatPac-Dune Entertainment,*

*RatPac Access Entertainment, and, Malpaso Productions)*

100. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 71, 73 through 88, and 92 through 94, hereinabove, as if more fully set forth in this Paragraph 100.

101. The foregoing Defendants each had the right and ability to control the acts of other infringers herein, and received direct financial benefit from the infringements. Accordingly, said Defendants are liable to Plaintiff for vicarious copyright infringement.

102. As a direct and proximate result of said Defendants' vicarious copyright infringement, Plaintiff has suffered, and will continue to suffer, monetary damage, in an amount not yet ascertained but to be proven at trial, and irreparable harm.

103. Plaintiff is entitled to injunctive relief against Defendants for their vicarious copyright infringements, as provided in 17 U.S.C. § 502, namely, to preliminary and permanent injunctions preventing said Defendants, their officers, agents, servants, employees, attorneys, and all those acting in concert or participation therewith, from directly or indirectly copying and distributing the Work; preparing derivative works based upon or adapted from the Work; performing the Work, in whole or in part; performing or distributing derivative works based upon the Work, or works containing protected expression therefrom; and/or authorizing others to engage in such activities.

104. Plaintiff is further entitled to recover from said Defendants, Plaintiff's actual damages, plus any profits resulting from the infringements, under 17 U.S.C. § 504(b); statutory damages in lieu of actual damages, if Plaintiff so elects, under 17 U.S.C. § 504(c); and, Plaintiff's attorneys' fees and the costs of this action, under 17 U.S.C. § 505. Finally, Plaintiff is entitled to an Order allowing for the impoundment and destruction of any and all infringing articles under 17 U.S.C. § 503.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

A. That Defendants, their officers, agents, servants, affiliates, employees, attorneys and representatives, related companies, and all those in privity or acting in concert therewith, be forthwith preliminarily and/or permanently enjoined and restrained, from directly or indirectly infringing Plaintiff's copyrights in the Work in any manner, including by copying, reproducing, and/or imitating the Work; preparing, distributing, and/or publishing derivative works based upon the Work, or works containing protected expression therefrom; performing the Work, in whole or in part; performing or distributing derivative works based upon the Work, or works containing protected expression therefrom; and/or authorizing others to engage in such activities; and, preliminarily and permanently enjoined from continuing the ongoing, nationwide and foreign distribution of the *Jersey Boys Movie*, until such time as all infringing material has been removed;

B. That Defendants be required to account for all gains, profits and advantages derived from, or caused by, each of their direct infringements, willful infringements, contributory infringements, and/or vicarious infringements of Plaintiff's copyright in the Work, and pay to Plaintiff such damages as Plaintiff has sustained as a consequence of each infringement thereof, plus any additional profits resulting from the infringements, under 17 U.S.C. § 504(b), or such other damages as this Court may deem proper within the provisions of the Copyright Act, including statutory damages in lieu of actual damages, if elected by Plaintiff under 17 U.S.C. § 504(c), and enhanced damages for Defendants' willful infringements, under 17 U.S.C. § 504(d);

C. That Defendants be required to pay Plaintiff's attorneys' fees and the costs of this action under 17 U.S.C. § 505;

D. That Defendants be ordered to deliver up on oath, for impoundment and destruction, any and all infringing articles, under 17 U.S.C. § 503, including but not limited to outlines, treatments, draft scripts, production scripts, manuscripts, books, records, film reels, magnetic tapes, hard drives, DVDs, Blu-ray discs, and other items

which include material taken or adapted from the Work;

E. That the Court impose a constructive trust on all gains and profits realized by Defendants as a direct or indirect result of their acts of infringement, contributory infringement, and/or vicarious infringement, including, but not limited to, gains and profits realized from the distribution, performance, rental, lease and lending of the *Jersey Boys Movie*, in all media of expression, throughout the U.S. and abroad;

F. That Plaintiff be granted prejudgment and post-judgment interest; and,

G. That the Court provide Plaintiff with such other and further relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED:

DATED: July 10, 2017

By : /s/Gregory H. Guillot
Gregory H. Guillot
Stephen M. Doniger
Scott Alan Burroughs

Attorneys for Plaintiff, Donna Corbello